**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CHRISTINA GARCIA, CALLIE BLAND, DANIELLE FRYE, and ROHMA SIDDIQUI, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>ABBVIE INC.,<br><br>*Defendant.* | Case No. 1:26-cv-07542<br><br>**FIRST AMENDED**<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff CHRISTINA GARCIA, CALLIE BLAND, DANIELLE FRYE, and ROHMA SIDDIQUI (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following class action complaint (the "Action") against Defendant ABBVIE INC. (collectively, "Defendant") for violations of state statutes and common law doctrines seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and their reasonable costs and attorneys' fees upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel as follows:

**INTRODUCTION**

1. "Fillers" are dermal fillers whereby patients are injected with gel-like substances to enhance cosmetic volume, treat wrinkles, or otherwise modify or enhance facial contours – and they have become an industry onto themselves. Today, millions of Americans – mostly women – are too casually injected with fillers that have lasting and deleterious effects on their health. For so many women, like Plaintiffs and Class, the injections of filler leave them with a Hobson's Choice: either risk lasting, negative effects by keeping unwanted filler in their faces *or* potentially face severe implications by attempting to remove it.

2. This is an Action about Defendant's filler, Juvederm, which, for the most part, is Hyaluronic Acid ("HA") in various forms in combination with a binding agent. By no means is HA, on its own, problematic – it is an organic substance already found in the body. The problem is that HA fillers can contain. Impurities, as well as a its binding agent and that (mostly) women are misled to believe that Juvederm can readily be removed from the body – despite it being a foreign substance with a binding agent – and that, if a woman does not like her dermal fillers, she can easily have them taken out. Abbvie knows this. The dermal filler itself would be less effective

if it lacked the binding agent that makes the HA remain in place. As such, Juvederm uses a crosslinking toxin to stabilize the HA dermal fillers using a product called 'butanediol diglycidyl ether' (or "BDDE").[1] The combination of BDDE and HA are "proinflammatory" and it is "hypothesized that normal breakdown of the product over time leads to release of low molecular weight HA" which causes negative impact to health including "precipitating delayed granuloma formation."[2] Indeed, to this day, Juvederm's warning label makes no mention of BDDE, only the existence of a "physiologic buffer."[3]

3. Women who are misled by Abbvie to believe that their Juvederm dermal fillers can be removed using hyaluronidase (the removal agent) are also subjected to substantial risk of the body attacking itself. Autoimmune reactions take place swiftly and painfully when the body is exposed to removal agents that attempt to move or remove dermal fillers – resulting in serious disorders that, again Juvederm's warning label makes no mention of. Studies have shown that Juvederm's most popular products, including Juvederm Voluma and Juvederm Volux are the "most resistant fillers" requiring higher amounts of hyaluronidase to remove them.[4] In fact, many of Juvederms various dermal filler products were among the very hardest to dissolve using hyaluronidase in comparison to other dermal fillers as follows:

---

[1] Jonathan C. Michel, DDS, et al., "*Are delayed dermal filler granulomas more common since COVID-19?*," JOURNAL OF ORAL AND MAXILLOFACIAL SURGERY (ONLINE) (January 2023), at https://www.joms.org/article/S0278-2391(22)00898-9/fulltext.

[2] *Id.*

[3] https://www.rxabbvie.com/content/dam/rxabbvie/pdf/juvederm-ultra_dfu.pdf.

[4] Kristen E. Park, et al., *"Response of 21 Hyaluronic Acid Fillers to Recombinant Human Hyaluronidase*" PLAST. RECONSTR. SURG. GLOB. OPEN (ONLINE) (22 Dec. 2023), at https://pmc.ncbi.nlm.nih.gov/articles/PMC10745246/.

Fig. 1.




[5]

4. The way that Juvederm is made is what makes it hard to dissolve – and representations to the contrary are the reason why it should not be packaged, marketed, sold to doctors or providers, or otherwise injected into peoples' faces under the impression that it is some

[5] *Id.*

minor, lunch-break cosmetic treatment as opposed to the actual serious injection of a foreign body into a sensitive area which it is.

5. As studies have discussed at length but of which the dermal filler – and injectors of Juvederm dermal filler in particular – have not respected is that "[h]igher HA concentration, higher degree of crosslinking, and less free HA are all associated with greater resistance to dissolution […] such as the Juvederm products – something our findings supported."[6] These studies, in fact, were so undeniable that even the disclosures to these studies included Allergan (Abbvie's parent company)'s own speakers and consultants.[7]

6. At bottom, this is an Action on behalf of Plaintiffs Garcia, Bland, Frye, and Siddiqui who suffered serious repercussions and economic damages when they purchased Juvederm dermal filler injections and experienced severe medical consequences from their Juvederm dermal filler injections and/or removal. Had Abbvie labeled their products as products which could not be easily removed, warned Plaintiffs and Class members of the implications of trying to remove those products, and warned Plaintiffs and Class members of the harm that Juvederm's products could cause generally sans removal attempts, none of the Plaintiffs (and probably most of the Class members) would have paid for Abbvie to destroy their bodies and disfigure their faces.

7. Abbvie simply cannot market their Juvederm dermal filler products as being long-lasting while also marketing them as being easy to modify or remove – the human body is not built to be injected with a foreign body that maintains its integrity while also being a foreign body that does not maintain that same integrity:

---

[6] *Id.*

[7] *Id.*




**Image 1:** Abbvie's website for Juvederm (home page)




**Image 2:** Abbvie's website for Juvederm (outcomes page)

8. Meanwhile, providers openly provide hyaluronidase as the mechanism to dissolve HA while the fine print on Abbvie's own website raises more questions than it does answers: in a section entitled "Important Safety Information," Abbvie incredulously states "[t]he effectiveness of removal of any dermal filler has not been studied."


JVÉDERM
LECTION OF FILLERS

Find a Provider

IMPORTANT SAFETY INFORMATION

**Are there any reasons why I should not receive any JUVÉDERM® formulation?**
Do not use these products if you have a history of multiple severe allergies or severe allergic reactions (anaphylaxis), if you are allergic to lidocaine or the Gram-positive bacterial proteins used in these products, or if you have had previous allergic reactions to hyaluronic acid fillers.

**What warnings should my doctor advise me about?**

- One of the risks with using dermal fillers is the unintentional injection into a blood vessel. The chances of this happening are very small, but if it does happen, the complications can be serious and may be permanent. These complications, which have been reported for facial injections, can include vision abnormalities, blindness, stroke, temporary scabs, or permanent scarring of the skin. Most of these events are irreversible.
- If you have changes in your vision, signs of a stroke (including sudden difficulty speaking, numbness or weakness in your face, arms or legs, difficulty walking, face drooping, severe headache, dizziness, or confusion), white appearance of the skin, or unusual pain during or shortly after treatment, you should notify your health care practitioner immediately.
- The use of dermal fillers where skin sores, pimples, rashes, hives, cysts, or infections are present should be postponed, as this may delay healing or make skin problems worse.
- The effectiveness of removal of any dermal filler has not been studied.

**Image 3**: Abbvie's Important Safety Information

9. And yet, Abbvie itself says that Juvederm can be "dissolved if needed" in its own marketing materials – including with hyaluronidase, despite Abbvie maintaining warnings that the effectiveness of removal of dermal filler has not been studied.




**Image 4:** Abbvie's Website on HA Fillers – Facts and Myths

10. The time has come for the filler industry – and Abbvie – to be held responsible for the administration of serious medical procedures which are taken way too lightly. Women's healthcare cannot remain a timeless exercise of experimentation and hoping for the best: Plaintiffs and Class members deserved to know the truth about Juvederm and the risks it carries to this very day. These are injections into people's faces – not merely some passing cosmetic exercise, and it necessitates the medical seriousness it deserves. Critically, not only do Plaintiffs and Class members rely on the representations on the Abbvie webpages, but providers do as well. Those who provide Juvederm injections affirmatively believe what Abbvie says on its website and its other materials because those providers have to be able to articulate what Juvederm does, is, and is not.

11. Currently, millions of Americans – mostly women – receive fillers on an annual basis, with over 5,294,603 Juvederm and other HA fillers were administered in 2023 alone:

outpaced only by Botox (9,480,929 injections).[8] Filler injections have only grown more popular since 2023 due to the accessibility of the products, the rise in "medispa" treatment centers (which offer an easier process for getting access to the products, though often with professionals that may be lesser trained than a doctor or nurse practitioner), and the proliferation of the general appearance that fillers provide on social media. In this instance, the active ingredient in Juvederm is HA, which is a naturally occurring substance in the body that functions to "keep skin well-hydrated, moisturized, and plump."[9] Unfortunately, due to the presence of fillers on social media, fillers are now being injected into patients 19 and younger at the rate of thousands of patients per year in the United States, including HA injections like Juvederm.[10]

12. Unfortunately for Plaintiff and Class members, who received Juvederm injections, one of the less common risks, the risk of developing hard masses called granulomas, has grown to be prevalent and can cause exceedingly dangerous circumstances for the patient. A granuloma, according to the Cleveland Clinic, is "an area of tightly clustered immune cells or inflammation in the body [which] form around an infection or foreign object[.]"[11] Generally, granulomas are hard lumps that appear lighter or darker than the surrounding skin and can be exceedingly painful to touch.[12] The symptoms of granuloma also can include fever, shortness of breath (dyspnea),

---

[8] Cross Plastic Surgery, "*Fillers On the Rise: Juviderm Proves to Be an Increasingly Popular Choice*," CROSSPLASTIC BLOG (ONLINE) (Oct. 30, 2024), at https://crossplasticsurgery.com/blog/fillers-on-the-rise-juvederm-proves-to-be-an-increasingly-popular-choice/.

[9] *Id.*

[10] "*FDA Executive Summary General Issues Panel Meeting on Dermal Fillers*," FOOD AND DRUG ADMINISTRATION: GENERAL AND PLASTIC SURGERY DEVICES ADVISORY COMMITTEE PANEL (Aug. 13, 2025), https://www.fda.gov/media/188185/download.

[11] https://my.clevelandclinic.org/health/diseases/24597-granuloma, (last accessed June 23, 2026).

[12] *Id.*

cough, swollen lymph nodes, night sweats, eye redness or pain, vision problems, pain, hard lumps under the skin, and headaches.[13] Generally, granulomas, and specifically calcified granulomas which do not go away on their own, can go away but otherwise must be either treated with extensive steroid treatment or surgery, and can lead to permanent disfigurement.[14] This is particularly problematic for those who develop granulomas from HA filler injections like Juvederm because the presence of hard lumps, modules, scarring, and disfigurement generally occur in injection sites which are in the worst possible place: the face – an image of a facial granuloma caused by an HA filler appears as follows:[15]



**Image 5:** Delayed Onset Granuloma Caused by HA Filler

[13] *Id.*

[14] https://www.pinnacleskin.com/conditions/granuloma, (last accessed June 23, 2026).

[15] David K. Funt, "*Treatment of Delayed-onset Inflammatory Reactions in Hyaluronic Acid Filler: An Algorithmic Approach*," NATIONAL INSTITUTE OF HEALTH PUBMED (ONLINE) (June 2022), at https://pubmed.ncbi.nlm.nih.gov/35747256/.

13. While the Food and Drug Administration notes the possibility as granuloma as a risk deep in their literature regarding HA filler injections,[16] Defendant's Juvederm product makes no such warning in its labeling other than noting in passing that there were some inflammatory nodules/granuloma in postmarket surveillance (which is not a warning label) of a mere 293 subjects in a reporting directly to the Food & Drug Administration ("FDA") – and that those subjects only received one formulation of Juvederm instead of the many different forms which exist.[17] However, the "WARNINGS" for Juvederm do not include any mention of granuloma whatsoever.[18] There are also no warnings of the impact that granulomas can cause – which is that they can create extensive discoloration, scarring and disfigurement as Plaintiff Garcia and others have suffered.

14. According to a study published by the National Institute of Health, the prevalence of granuloma due to Juvederm injections remain not only so significant that it should be taken more seriously but can occur with significant delayed onset months or even years after injections.[19] As the study concluded, informing patients of these complications and following up in case of occurrence is necessary for avoidance of disappointed patients.[20] And yet, Defendant's warnings about Juvederm make no disclosure.

---

[16] Food and Drug Administration, "*Dermal Filler Do's and Don'ts for Wrinkles, Lips and More*," FDA CONSUMER UPDATES (July 7, 2023), at https://www.fda.gov/consumers/consumer-updates/dermal-filler-dos-and-donts-wrinkles-lips-and-more, at 7.

[17] Juviderm Ultra Device Contraindications and Warnings, (last accessed June 23, 2026), at https://www.rxabbvie.com/content/dam/rxabbvie/pdf/juvederm-ultra_dfu.pdf.

[18] *Id.*

[19] Aman Dua, et al., "*Delayed Onset Nodules After Hyaluronic Acid Fillers: A Case Series*," NATIONAL INSTITUTE OF HEALTH PUBMED CENTRAL (ONLINE) (Jan. – Mar. 2022), at https://pmc.ncbi.nlm.nih.gov/articles/PMC9153319/.

[20] *Id.*

15. Part of the cause of this issue is that, while HA is a naturally occurring substance, the additional components in products like Juvederm – which seek to optimize and "improve longevity" – are not. As stated in the National Institute of Health:

> Hyaluronic acid fillers are one of the most widely used and versatile fillers worldwide. Although traditionally considered to be immunologically inert, many currently available products have been substantially modified to improve longevity or optimize properties for specific indications. Such modifications, either alone or in combination with other factors […] may lead to the development of late-onset inflammatory nodules in some patients.[21]

16. A key problem with the onset of granulomas is that they occur in such a delayed fashion – this is scientifically proven to be the case with Juvederm's HA fillers. In the study conducted by Dr. Funt, he concluded that "although no safety concerns were raised in the initial 6-month trials with [Juvederm] products, a number of retrospective chart reviews have subsequently documented reports of delayed-onset nodules with rates ranging from 0.5% to 0.98%, which is higher than that seen with other [non-Juvederm] HA fillers."[22]

17. The exact cause of the higher incidence of granuloma due to Juvederm fillers is currently up for debate – but what is for certain is that it occurs and that it causes real harm to Plaintiffs and Class members. One theory is that Juvederm uses a crosslinking toxin to stabilize the HA dermal fillers using a product called 'butanediol diglycidyl ether' (or "BDDE").[23] The combination of BDDE and HA are "proinflammatory" and it is "hypothesized that normal

---

[21] David K. Funt, "*Treatment of Delayed-onset Inflammatory Reactions in Hyaluronic Acid Filler: An Algorithmic Approach*," NATIONAL INSTITUTE OF HEALTH PUBMED (ONLINE) (June 2022), at https://pubmed.ncbi.nlm.nih.gov/35747256/.

[22] *Id.*

[23] Jonathan C. Michel, DDS, et al., "*Are delayed dermal filler granulomas more common since COVID-19?*," JOURNAL OF ORAL AND MAXILLOFACIAL SURGERY (ONLINE) (January 2023), at https://www.joms.org/article/S0278-2391(22)00898-9/fulltext.

breakdown of the product over time leads to release of low molecular weight HA precipitating delayed granuloma formation."[24] Indeed, Juvederm's warning label makes no mention of BDDE, only the existence of a "physiologic buffer."[25]

18. The harm to patients remains tangible. As Dr. Funt's study discusses:

> Delayed-onset inflammatory reactions are rare events occurring with an incidence of less than 1%. However, as the popularity and acceptance of soft-tissue fillers continues to grow, so too with the occurrence of adverse events. Although delayed-onset reactions may not be the most feared complication of treatment, they nevertheless can be disfiguring and, until their resolution, can significantly affect patients' quality of life.[26]

19. And despite these harms, the risk of granuloma is incredibly absent from Defendant's "Patient Safety Formula" on their website – which includes purported safety disclosures.[27]

20. Against this backdrop, Plaintiffs, on behalf of herself and all others similarly situated, bring this Action due to the defective Juvederm products and the failure to warn of the risk of automimmune disorders and granuloma, seeking damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state statutes and common law doctrines due to Defendant's acute failure to ensure that the Juvederm products were: (1) fit and safe for their ordinary purpose which is to be consumed, (2) marketed free from omissions regarding the risk of granuloma as a result of the ordinary use of the Juvederm products and (3) inclusive of warnings which would give

---

[24] *Id.*

[25] https://www.rxabbvie.com/content/dam/rxabbvie/pdf/juvederm-ultra_dfu.pdf.

[26] David K. Funt, "*Treatment of Delayed-onset Inflammatory Reactions in Hyaluronic Acid Filler: An Algorithmic Approach*," NATIONAL INSTITUTE OF HEALTH PUBMED (ONLINE) (June 2022), at https://pubmed.ncbi.nlm.nih.gov/35747256/.

[27] https://www.rxabbvie.com/pdf/juvederm-ultra_pt_lb.pdf, (last accessed June 26, 2026).

Juvederm's patient's the opportunity to make informed choices after being apprised of the attendant and potential risks.

21. As a result of the foregoing, Plaintiffs and Class members (defined below) were harmed by paying a price premium for the Juvederm products which they otherwise would not have paid for due to the risk of granuloma as well as actual consequential damages to remediate the harm caused by Defendant's failure to warn of Juvederm granulomas and the defective Juvederm products sold into commerce.

## JURISDICTION AND VENUE

22. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act of 2005 ("CAFA") because there are (a) more than 100 members of the proposed classes, (b) some members (including Plaintiffs) of the proposed classes have a different domicile or citizenship from the Defendant, and (c) the claims of the proposed class members exceed $5 million, exclusive of costs and fees. Specifically, there are thousands of members of the proposed classes – hundreds of millions of dollars-worth of Juvederm products sold annually across the country; Plaintiff Garcia is domiciled in Vacaville, California while Defendant Abbvie is headquartered in Chicago, Illinois; and the measure of damages as alleged well exceeds $5 million dollars.

23. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant because: (1) Defendant Abbvie is headquartered in Chicago, Illinois, and (2) Defendant conducts significant business in Illinois such that they purposefully availed themselves of the privilege of doing business in Illinois.

24. *Venue.* Venue is proper in this Court because Defendant transacts business within this District and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

## PARTIES

### PLAINTIFF

***Plaintiff Christina Garcia***

25. Plaintiff Christina Garcia is domiciled in California.

26. In 2023, Plaintiff Garcia received numerous Juvederm injections in her face and paid thousands of dollars for her injections. Because insurance does not cover the cost of Juvederm injections, Plaintiff Garcia paid out of pocket for each injection. In June of 2026, three years later, Plaintiff Garcia became extremely ill as a result of delayed onset granuloma which occurred due to Juvederm. Plaintiff Garcia was hospitalized and had to receive numerous medical procedures to address the harm caused by Juvederm granulomas. Plaintiff Garcia now has significant autoimmune issues which have resulted from Juvederm injections and/or the use of hyaluronidase to edit or otherwise remove those Juvederm injections. Plaintiff Garcia has spent thousands of dollars on her medical care, leaving her in a dire financial situation. Currently, Plaintiff Garcia is taking chemotherapy and immosuppressive medications due to the medical injuries that Juvederm caused to Plaintiff Garcia's immune system. She has paid substantial sums out of pocket for her health costs and continues to do so.

27. Plaintiff Garcia is a licensed pharmacist, reads every warning label before consuming or using cosmetic products and other types of medication, and is otherwise extremely meticulous about her use of cosmetic and other medical products; she did not have the opportunity to choose whether to use Juvederm (which she would not have had she known the attendant risk

of granuloma) because Defendant omits any warnings about Juvederm and risk of significant automimmune disease, granuloma or delayed onset granuloma.

28. Had Defendant marketed their Juvederm accurately and refrained from making these vital omissions regarding the risk of granuloma and delayed onset granuloma, Plaintiff Garcia would have been aware of this and would not have purchased Juvederm injections or would have paid substantially less for them.

***Plaintiff Callie Bland***

29. Plaintiff Callie Bland is domiciled in California and Canada.

30. In 2023, Plaintiff Bland received numerous Juvederm injections in her face and paid thousands of dollars for her injections. Because insurance does not cover the cost of Juvederm injections, Plaintiff Bland paid out of pocket for each injection. Years later, Plaintiff Bland has suffered from significant medical injuries including the triggering of autoimmune inflammatory syndrome, resulting in connective tissue diseases and the production of antibodies which attack Plaintiff Bland's own tissue. Currently, Plaintiff Bland is on an immunosuppressant medication as a result of the harm caused by Juvederm and/or the use of hyaluronidase to either edit or remove her Juvederm injections.

31. Plaintiff Bland has suffered significant economic damages since her Juvederm injections and resulting injuries. Specifically, Plaintiff Bland's illness has caused her to be unable to work, resulting in a complete loss of her business. Plaintiff Bland's injuries have devasted her health, her finances, and her family. She has paid substantial sums out of pocket for her health costs and continues to do so. Plaintiff Bland now runs several organizations which advocate for women who have suffered from the same issues that she did as a result of Juvederm injections.

32. Had Defendant marketed their Juvederm accurately and refrained from making these vital omissions regarding the risk of granuloma and delayed onset granuloma, Plaintiff Bland would have been aware of this and would not have purchased Juvederm injections or would have paid substantially less for them.

***Plaintiff Danielle Frye***

33. Plaintiff Danielle Frye is domiciled in West Virginia.

34. In February and April of 2026, Plaintiff Frye received numerous Juvederm injections in her face and paid thousands of dollars for her injections. Because insurance does not cover the cost of Juvederm injections, Plaintiff Frye paid out of pocket for each injection. In June of 2026, months later, Plaintiff Frye became extremely ill as a result of delayed onset granuloma which occurred due to Juvederm – she developed two 1-4 inch wide and a 3 inch wide "rock" solid granulomas on the left side of her chin. After numerous hyaluronidase injections, the granulomas did not go down. Plaintiff Frye visited multiple doctors, including plastic surgeons and specialists who are attempting to resolve her granulomas with limited success. Plaintiff Frye has now developed a second set of granuloma on the right side of her face.

35. Plaintiff Frye is emotionally and financially exhausted as a result of the injuries caused by Juvederm injections. She has paid substantial sums out of pocket for her health costs and continues to do so.

36. Had Defendant marketed their Juvederm accurately and refrained from making these vital omissions regarding the risk of granuloma and delayed onset granuloma, Plaintiff Frye would have been aware of this and would not have purchased Juvederm injections or would have paid substantially less for them.

***Plaintiff Rohma Siddiqui***

37. Plaintiff Rohma Siddiqui is domiciled in New York, New York.

38. Plaintiff Siddiqui has a career as an online personality and model, including having done modeling work for Defendant – and, specifically, with regard to Juvederm. Plaintiff Siddiqui was previously employed by Defendant and was the digital face for Juvederm – though, unbeknownst to her, it would derail her career and put her life in jeopardy.

39. Plaintiff Siddiqui received numerous Juvederm injections in her face and paid thousands of dollars for her injections. Because insurance does not cover the cost of Juvederm injections, Plaintiff Siddiqui paid out of pocket for each injection. For at least two years, Plaintiff Siddiqui has been extremely ill due to the lasting and deleterious medical effects of Juvederm as well as the hyaluronidase used to edit or otherwise remove unwanted Juvederm in her face.

40. Plaintiff Siddiqui has developed significant autoimmune issues as a result of the hyaluronidase injections she received to dissolve her Juvederm cosmetic filler. As a result of these medical issues, Plaintiff Siddiqui's earnings and earning potential have significantly plummeted, which have left her in dire financial straits. Additionally, she has paid substantial sums out of pocket for her health costs and continues to do so. Plaintiff Siddiqui now dedicates a significant amount of her time helping other women who have suffered from what she has gone through as a result of her Juvederm injections.

41. Had Defendant marketed their Juvederm accurately and refrained from making these vital omissions regarding the risk of granuloma and delayed onset granuloma, Plaintiff Siddiqui would have been aware of this and would not have purchased Juvederm injections or would have paid substantially less for them.

## DEFENDANT

***Defendant Abbvie Inc.***

42. Defendant Abbvie, Inc. is a North Chicago, Illinois-based corporation which produces cosmetic products distributed throughout the United States – including the products at issue, Juvederm injectables.

## FACTUAL ALLEGATIONS

***The Regulatory Landscape and Juvederm***

43. The Federal Food, Drug, and Cosmetic Act ("FDCA") regulates cosmetic products under the premarket approval ("PMA") process which pose risks to patient safety and are subject to regulatory controls. *See,* 21 U.S.C. § 301 *et seq*. Specifically, the FDCA, as a regulatory statute, requires truthful and non-misleading labeling which must be updated when attendant risks are discovered, even after a cosmetic product is distributed into commerce. *See,* 21 C.F.R. § 814.39(d). Generally, violations of the FDCA are enforced by the Food & Drug Administration ("FDA") but victims of mislabeling and omissions related to FDA-regulated products can bring state law causes of action seeking redress.

44. Juvederm is such a cosmetic product.

45. According to the FDA, "[Juvederm] are biodegradable, non-pyrogenic, visoelastic, clear, homogenized gel implant[s]. They consist of stabilized hyaluronic acid (HA) produced by *Streptococcus equi* bacterial formulated to a concentration of 24 mg/ml in a physiological buffer" either with or without 0.3% lidocaine.[28] The purpose of Juvederm is "for

[28] https://www.accessdata.fda.gov/cdrh_docs/pdf5/P050047S005M.pdf, (last accessed June 26, 2026).

injection into the mid to deem dermis for correction of moderate to severe facial wrinkles or folds."[29]

46. Defendant has approval for four variants of Juvederm: Juvederm Ultra and Juvederm Ultra Plus as well as two variations of each – with and without lidocaine for purposes of pain relief (collectively, the "Juvederm Products").

47. On August 18, 2008, Allergan (a subsidiary of Defendant) applied for PMA approval of Juvederm Products.[30] On January 7, 2010, Allergan was sent a letter of approval for a modification of Juvederm (to add lidocaine) which stated: "[t]he sale and distribution of [Juvederm] [is] restricted to prescription use in accordance with […] [the] Federal Food, Drug, and Cosmetic Act" and that Juvederm is subject to "the many [] FDA requirements requiring the manufacture, distribution, and marketing of devices."[31] One of these reporting requirements as stated by the Juvederm Approval Letter is that the FDA must be informed no later than thirty (30) calendar days after they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their manufactured devices "may of caused or contributed to a death or serious injury" or "has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contributed to death or serious injury if the malfunction were to recur."[32]

---

[29] *Id.*

[30] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P050047S005, (last accessed June 26, 2026).

[31] https://www.accessdata.fda.gov/cdrh_docs/pdf5/P050047S005A.pdf, (last accessed June 26, 2026) (the "Juvederm Approval Letter").

[32] Juvederm Approval Letter, at 2.

48. Additionally, the FDA states in the Juvederm Approval Letter, "[we] do not evaluate information related to contract liability warranties. We remind you: however, that the device labeling must be truthful and not misleading."[33] The Juvederm Approval Letter continues, "[t]he introduction of delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of [PMA] approval is a violation of law."[34]

49. ***Risk of Granuloma and Delayed Onset Granuloma.*** Granulomas form as a result of HA filler injections "to encapsulate and isolate foreign materials that cannot be removed immediately by the enzymatic breakdown [process] or phagocytosis."[35] While HA is a natural component of human tissue, any sort of modification of HA which is injected as a filler will be "recognized as a foreign material when implanted into the body."[36] As the Archive of Plastic Surgery had stated, "[t]he foreign body reaction is the final stage of inflammation and wound healing after implantation."[37] As that study concluded, "delayed inflammatory reactions are related to foreign body reactions and recurrent inflammation around the injected [HA] filler."[38] Thus, the "injected filler should be as pure as possible without impurities" – however, Juvederm either contains impurities or the immune systems of Plaintiffs and Class members who suffer from delayed onset granuloma perceive Juvederm as an impurity by design.[39]

---

[33] *Id.*

[34] *Id.*, at 3.

[35] Won Lee, et al., "*Etiology of Delayed Inflammatory Reaction Induced by Hyaluronic Acid Filler*," ARCHIVES OF PLASTIC SURGERY (ONLINE) (Feb. 7, 2024).

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

50. While Defendant knows this, it does not apprise Plaintiffs and Class members of these risks.

51. Indeed, Defendant conducted a test of 72 subjects who were enrolled and randomized and injected the Juvederm Products – Juvederm with lidocaine (for pain relief) and Juvederm without lidocaine, for purposes of getting FDA approval to add a modified Juvederm variant with use of lidocaine.[40] The summarization of that study showed similar safety profiles for both and reveal adverse events by severity.[41] The study revealed more than half of those who received Juvederm Product injections (65% to 68%) suffered from lumps and bumps at the injection site.[42] Additionally, the study revealed that 11% of subjects suffered from nodules at the injection site when being administered the Juvederm Ultra product; and the numbers were even higher for those who received Juvederm Ultra Plus where between 19% to 22% of subjects showed incidence of nodules.[43]

52. This can be seen from the study's materials below:[44]

---

[40] https://www.accessdata.fda.gov/cdrh_docs/pdf5/P050047S005M.pdf, ("Juvederm Study").

[41] *Id.*, at 4.

[42] *Id.*

[43] *Id.*, at 5.

[44] *Id.*

| | Ultra | | Ultra Plus | |
|---|---|---|---|---|
| | JULIDO (N=36 NLFs) | JUVDRM (N=36 NLFs) | JULIDO (N=36 NLFs) | JUVDRM (N=36 NLFs) |
| System Organ Class/ Preferred Term | % (n/N) | % (n/N) | % (n/N) | % (n/N) |
| **One or More Adverse Event** | 25% (9/36) | 28% (10/36) | 33% (12/36) | 28% (10/36) |
| **General disorders and administration site conditions** | 25% (9/36) | 28% (10/36) | 33% (12/36) | 28% (10/36) |
| Application site bruising | 8% (3/36) | 8% (3/36) | 8% (3/36) | 6% (2/36) |
| Injection site discoloration | 8% (3/36) | 6% (2/36) | 14% (5/36) | 11% (4/36) |
| Injection site erythema | 8% (3/36) | 8% (3/36) | 6% (2/36) | 6% (2/36) |
| Injection site induration | 19% (7/36) | 17% (6/36) | 11% (4/36) | 14% (5/36) |
| Injection site nodule | 11% (4/36) | 11% (4/36) | 19% (7/36) | 22% (8/36) |
| Injection site edema | 8% (3/36) | 11% (4/36) | 3% (1/36) | 6% (2/36) |
| Injection site pain | 8% (3/36) | 3% (1/36) | 0% (0/36) | 3% (1/36) |
| Injection site pruritus | 3% (1/36) | 3% (1/36) | 0% (0/36) | 0% (0/36) |

**Table 7:** Summary of AE by product

53. Thus, for over a decade and a half, Defendant has known of the risk of nodules at the injection site: but their own studies did not follow through to examine the risk of granuloma and delayed onset granuloma even though there were similar (yet not identical) issues that came up.

54. ***Juvederm's Risk of Auto-Immune Injury.*** Additionally, Juvederm has a significant risk of causing autoimmune issues which are not adequate disclosed by Juvederm.

55. Essentially, this risk comes to pass as follows.

56. Juvederm on its own can cause inflammatory reactions.[45] Specifically, "hyaluronic acid filler injections can induce foreign body reactions and carry a relatively high risk of granuloma formation."[46] And yet, these risks are not made known to patients like Plaintiffs and Class members; upon information and belief, the failure to disclose these risks publicly on

[45] Won Lee, et al., "*Etiology of Delayed Inflammatory Reaction Induced by Hyaluronic Acid Filler*," ARCHIVES OF PLASTIC SURGERY (ONLINE) (Feb. 7, 2024).

[46] *Id.*

Defendant's website and in other materials means that providers are also unaware of these risks, and cannot properly apprise Plaintiffs and Class members of them.

57. Inflammatory reactions too may be triggered by impurities within the HA fillers.[47] Previous studies have revealed that: (1) stainless steel is commonly found in machinery during manufacturing, (2) aluminum particles may exist during the manufacturing process of prefilled glass syringes which can induce an immune-response, and (3) silicone oil is often used as a lubricant within the prefilled syringes itself, and can be found in HA filler, which also can induce immune-response.[48] Plaintiffs and Class members are often left wondering which aspect of the Juvederm injection and removal process caused immune-responses – but the reality is that had they known of the risks of this harm, they would not have engaged with nor paid for Juvederm products.

58. These issues are compounded as HA fillers and cosmetic procedures generally become more popular and accessible.[49] Indeed, a significant number of those who receive HA fillers (and, subsequently, hyaluronidase) are suffering from significant autoimmune issues, which necessitate acute treatment.[50] In many patients, these issues are "delayed reactions which may occur after weeks, months, or even years."[51] The Clinical, Cosmetic, and Investigational Dermatology Journal notes that in one study, 25% of patients developed delayed immune

---

[47] *Id.*

[48] *Id.*

[49] Agnieska Owczarczyk-Saczonek, et al., "*Hyaluronic Acid Filers and ASIA Syndrome: Case Studies*," CLINICAL, COSMETIC AND INVESTIGATIONAL DERMATOLOGY (DOVEPRESS ONLINE) (Oct. 5, 2023).

[50] *Id.*

[51] *Id.*

reactions after HA injections – and, in a larger cohort study of 500 cases, as many as 29.5% of patients developed immune disorders.[52] These are risks too large and too well known for a company as well financed and with as much experience as Abbvie to simply miss them – instead Defendant made a deliberate choice not to warn of them for financial profit.

***Juvederm and the Failure to Warn***

59. Juvederm is one of the most prevalent forms of fillers that patients request – and millions of injections of Juvederm occur each year. Juvederm is manufactured by one of the most well-known pharmaceutical corporations on earth and is distributed to thousands of medical providers across the United States.

60. However, those providers cannot adequately inform their patients of risks and patients cannot assume the risk of Juvederm Products which can and do cause autoimmune disorders granuloma, delayed onset granuloma, and the terrible, lasting disfiguration that follows. Indeed, most patients receive Juvederm Products on their faces (as it is defined by the FDA for facial wrinkles) and would not assume the risk of disfiguring their face – even if the risk were small – by injecting Juvederm Products.

61. Clearly, these Juvederm Products are not fit for their intended purpose.

62. With respect to granuloma, Juvederm's labeling downplays the significance of what Plaintiff Garcia and Class members have gone through to the point where the label itself not only omits the word granuloma in its entirety, but mischaracterizes the general use of the word "nodule" (a granuloma is a form of a nodule) as a harmless side effect which "in most cases, [go] away within 1 month."[53] This is a deliberate choice to mislead medical providers who examine

---

[52] *Id.*

[53] https://www.rxabbvie.com/pdf/juvederm-ultra_pt_lb.pdf, (last accessed June 26, 2026).

these materials as well as to keep patients in the dark about the real risks of granuloma and delayed onset granuloma: facial disfigurement by a product which is supposed to do the very opposite.

63. The warning label also discusses "cases of delayed-onset inflammation" but states that they occur following viral or bacterial illnesses (or infection, vaccination, or dental procedures) but that "the *reported* inflammation was responsive to treatment and resolved on its own."[54]

64. Buried in the warning label is a laundry list of over thirty (30) different potential complications and adverse events – none of them contain the word granuloma. Additionally, the warning label fails to properly apprise Plaintiffs and Class members of the risk of significant autoimmune disorders which can result as a risk of using HA fillers, including Juvederm.

65. To date, there are a glossary of over twenty (20) terms in the Juvederm warning materials, with zero definition for the word granuloma.[55] The clinical study for Juvederm contained in the warning labels make no mention of granuloma, even though they account for eight (8) other different reactions.[56] Those reactions (redness, pain/tenderness, firmness, swelling, lumps/bumps, bruising, itching, discoloration) are not nearly as severe as the pain and suffering that Plaintiffs went through with delayed onset granuloma. Defendant's omission of the risk of granuloma is questionable and concerning given the willingness to only reveal more innocuous risks.

[54] *Id.*

[55] https://www.rxabbvie.com/pdf/juvederm-ultra_pt_lb.pdf, (last accessed June 26, 2026).

[56] *Id.*

66. Additionally, Juvederm's own website, which Plaintiff Garcia reviewed, contains no mention of granuloma, delayed onset granuloma, severe disfiguration, or even nodules in the portion of the website which discusses side effects. In fact, this section can be seen below:

> **What are possible side effects of treatment?**
>
> The most commonly reported side effects with JUVÉDERM® injectable gels were redness, swelling, pain, tenderness, firmness, lumps/bumps, bruising, discoloration, and itching. For JUVÉDERM® VOLBELLA® XC, dryness was also reported.
>
> These side effects are consistent with other facial injection procedures and most will resolve within 30 days. Your doctor may choose to treat side effects persisting longer with antibiotics, steroids, or hyaluronidase (an enzyme that breaks down hyaluronic acid).
>
> As with all skin injection procedures, there is a risk of infection.
>
> **To report a side effect with any product in the JUVÉDERM® Collection, please call the Allergan® Product Support Department at 1-877-345-5372. Please also visit Juvederm.com or talk to your doctor for more information.**
>
> Products in the JUVÉDERM® Collection are available only by a licensed physician or properly licensed practitioner.

67. The complete and utter failure to warn Plaintiffs and Class members of the risks of Juvederm Products is not a mistake – it is a conscious choice taken in light of studies cited above which clearly discuss these risks.

***Harm to Plaintiffs and the Class Members***

68. The harm to Plaintiffs and Class members is fairly straightforward: they paid out of pocket in substantial sums for a product to enhance their facial features which did the exact opposite. Additionally, that product failed to disclose the risks of facial disfigurement due to granuloma and used generalities (like "nodule" which is a blanket term) while underplaying the harm that truly existed and exists to this day.

69. Had Defendant marketed their Juvederm Products accurately and refrained from making these vital omissions regarding the risk of granuloma and delayed onset granuloma, Plaintiff and the Class members would have been aware of this and would not have purchased Juvederm Product injections or would have paid substantially less for them. Indeed, many of the Class members, including Plaintiffs would not have assumed the risk of autoimmune disorders and disease or resulting facial disfigurement due to delayed onset granuloma had they known of this risk – and, therefore, would not have purchased or paid for Defendant's Juvederm Products at all.

## CLASS ACTION ALLEGATIONS

70. Plaintiffs bring this Action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

> **Nationwide Class**: All persons within the United States who purchased the Juvederm Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").
>
> **Nationwide Granuloma Class**: All persons within the United States who purchased the Juvederm Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases and suffered granuloma or delayed onset granuloma ("Class Period").

71. Additionally, Plaintiffs brings this Action on behalf of the following subclasses as defined below:

> **California Class**: All persons within the state of California who purchased the Juvederm Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").
>
> **California Granuloma Class**: All persons within the state of California who purchased the Juvederm Products from the beginning of any applicable statute of

limitations period through the date of judgment or until the conduct alleged ceases and suffered granuloma or delayed onset granuloma ("Class Period").

**New York Class**: All persons within the state of New York who purchased the Juvederm Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

**New York Granuloma Class**: All persons within the state of New York who purchased the Juvederm Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases and suffered granuloma or delayed onset granuloma ("Class Period").

72. Excluded from the proposed Class are Defendants and any such entities in which the Defendant has a controlling interest, the Defendant's agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

73. *Numerosity.* The members of the Class are so numerous that joinder would be inefficient and impracticable. Based upon Defendant's annual sales statistics, there are tens of thousands of Class members across the country.

74. *Commonality.* There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members. These common questions of law and fact include, without limitation:

i. Whether Defendant violated state and common law statutes and doctrines;

ii. Whether Defendant engaged in the conduct as alleged;

iii. Whether Defendant was unjustly enriched;

iv. Whether Plaintiffs were harmed;

v. The measure of damages to Plaintiffs and Class members; and,

vi. Whether Plaintiffs are entitled to declaratory and injunctive relief.

75. *Typicality.* Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiffs, like all other Class members, was injured by Defendants' uniform conduct. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all other Class members, such that there are no defenses unique to Plaintiffs. The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

76. *Adequacy of Representation.* Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in class action litigation, and Plaintiffs intends to prosecute their action vigorously.

77. *Superiority of Class Action.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

78. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class

members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

79. Adequate notice can be given to Class members directly using information maintained in the parties' records.

80. *Predominance.* The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

81. This proposed class action does not present any unique management difficulties.

**COUNT I**
**VIOLATION OF THE CALIFORNIA'S UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200 et seq.)**
**CALIFORNIA SUBLCASSES**
***And All Substantially Similar State Statutes Nationwide***

82. Plaintiffs repeat the allegations in Paragraphs 1-81 as if fully set forth with the same force herein.

83. For purposes of California's Unfair Competition Law ("UCL"), Defendant is considered a business and Plaintiffs Garcia and Bland (as well as Class members) are considered consumers.

84. The UCL prohibits unfair, unlawful, and fraudulent acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.

85. ***Unfairness.*** Defendant committed unfair practices by employing material omissions about the presence (or risk of a presence) of granulomas and delayed onset granulomas due to the use of the Juvederm Products.

86. Information as to the content – and, specifically, the cause of granuloma as well as the risk of it occurring – as a result of the formulation of each of their Juvederm Products was

in the exclusive control of Defendant. Plaintiffs could not possibly have known that the Products contained substances or a formulation which caused granuloma or delayed onset granuloma.

87. Because Plaintiffs paid for Juvederm Products, Plaintiffs have standing to pursue this claim because they each suffered an economic injury due to lost money or property as a result of Defendant's acts or practices. When Plaintiffs purchased the Products, they relied on material omissions and implied warranties that the Products were fit for consumption and did not cause granuloma and facial disfigurement. Plaintiffs spent money in the transaction that they otherwise would not have spent had she known the truth about Defendants' Juvederm Products.

88. Defendant's conduct was unfair in a materially misleading way because it violates consumer's reasonable expectations. Defendant knew consumers would purchase its Juvederm Products and/or pay more for them under the false – but reasonable – impression through omission of the truth that they were safe to consume as advertised and consistent with warning labeling/packaging.

89. Defendant knows that this health information about its Juvederm Products, which are specifically marketed toward use in the patients' face, are extraordinarily sensitive and material to consumers. As a result of its unfair acts and practices, Defendant sold millions of the Juvederm Products to unsuspecting consumers nationwide.

90. ***Unlawful.*** The Defendant's conduct in this instance is unlawful because it violates the California Consumer Legal Remedies Act (the "CLRA"), the Federal Food, Drug & Cosmetic Act, and California's Sherman Law.

91. The reasons why each of these laws are violated is because the Juvederm Products: (1) leveraged Defendant's omissions and deceptions to induce Plaintiffs and Class members into purchasing the Juvederm Products which were of a different characteristic, value, or quality as

labeled or advertised; (2) did not comply with FDA labeling requirements with respect to making proper disclosures as required by 21 C.F.R. § 814.39(d) and the PMA process and because misbranded and/or unapproved drugs are unlawful and cannot be sold legally per 21 U.S.C. §§ 331, 333 (and, therefore, under California's Sherman Law §§ 109875, 110398, 110760, *et seq.*) the Juvederm Products have no economic value and are entirely worthless and (3) the Juvederm Products violate the Federal Food, Drug, and Cosmetic Act (and, therefore FDA regulations) because they contain materials which are "false and misleading in any particular [way.]" pursuant to 21 U.S.C. § 343(a)(1); 21 C.F.R. § 101.93(a)(3) – and therefore violate the Sherman Law as well.

92. As a direct and proximate result of Defendants' omissions, Plaintiffs and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the profound risk of granuloma, delayed onset granuloma, and automimmune disease and disorder as a result of Juvederm injections.

93. On behalf of themselves and Class members, Plaintiffs seek to enjoin Defendants' unlawful acts and practices. On behalf of themselves and Class members, Plaintiffs also seek to recover their actual damages or statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

**COUNT II**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750, *et seq.*)**
**CALIFORNIA SUBCLASSES**
***And All Substantially Similar State Statutes Nationwide***

94. Plaintiffs repeat the allegations in Paragraphs 1-81 as if fully set forth with the same force herein.

95. Plaintiffs Garcia and Bland brings this Count on behalf of all California Sub-Class members.

96. Defendant, as a seller of products to Plaintiffs and Class members, had a duty to disclose to consumers that the Juvederm Products contained material risks of granuloma and facial disfigurement.

97. Instead, Defendant concealed and suppressed material facts regarding the Juvederm Products.

98. This violates the CLRA because the CLRA prohibits representing that goods are of a particular standard, quality, or grade when they are not. *See,* Cal. Civ. Code § 1770(a)(7).

99. Here, Plaintiffs and the Class members purchased the Juvederm Products which were marketed as safe for consumption, omitted that there was a material risk of automimmune disease or disorder, granuloma and facial disfigurement, and that any risks of nodules were nominal.

100. Defendant charged, and Plaintiffs and Class members paid, a premium price for the Juvederm Products despite the availability of comparably priced Products with lower or non-existent levels of granuloma, facial disfigurement and profound risk of automimmune disease or disorder.

101. Defendant's omissions as alleged induced Plaintiff and the Class to make their purchases of the Juvederm Products. Plaintiffs were entirely unaware of these material facts, and would have paid less (or would not have purchased at all) the Juvederm Products for which she paid.

102. Accordingly, Defendant is liable to Plaintiffss and Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

103. Defendant's acts were done wantonly, maliciously, oppressively, deliberately with the intent to defraud, and in reckless disregard of Plaintiff Garcia and Bland's and other Class members rights in order to enrich itself.

**COUNT III**
**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAWS**
**(New York Gen. Bus. Law. § 349 et seq.)**
**NEW YORK SUBLCASSES**
***And All Substantially Similar State Statutes Nationwide***

104. Plaintiffs repeat the allegations in Paragraphs 1-81 as if fully set forth with the same force herein.

105. Under New York General Business Law, Section 349, Defendant is considered to be a "business" and Plaintiff Siddiqui and the members of the New York State Subclasses are "consumers."

106. Defendant made material omissions when it failed to disclose (1) the risks of delayed onset granuloma, (2) the risks of granuloma generally, and (3) the risk of autoimmune disorders which can all be caused by and are caused by Juvederm injections. Defendant was aware of these omissions – and they are material because Plaintiff Siddiqui and the members of

the New York State Subclasses would not have purchased services for Juvederm injections as well as the products themselves had they known of these risks.

107. As a result of these material omissions, Defendant profited because they would have had lower sales volumes as a result of the public being adequately aware of these risks. As such, Defendant owes Plaintiff Siddiqui and the New York State Class members their actual damages, treble damages, or statutory damages of $50 for each purchase of Juvederm services and Juvederm products, whichever is greater, as well as attorneys' fees and costs, pre- and post-judgment interest, and whichever other relief this Court deems just and proper.

**COUNT IV and V**
**FAILURE TO WARN**
**(STRICT LIABILITY AND NEGLIGENCE)**
**NATIONWIDE CLASSES**
***And All Substantially Similar State Laws***

108. Plaintiffs repeat the allegations in Paragraphs 1-81 as if fully set forth with the same force herein.

109. Defendant conducted extensive testing on their Juvederm Products as far back as over a decade and a half ago, and also had constructive notice from the studies and articles which were published on the risk of granuloma prior to Plaintiff Garcia and Frye's Juvederm Product injections – including studies cited in this Complaint which were from 2022 and 2023 which predated said injections. Additionally, Defendant knew or should have known of the risks of automimmune disorders prior to the medical issues that each of the Plaintiffs have suffered within the last two years.

110. Thus, Defendant knew or should have known about each of these risk in time to warn consumers.

111. At all relevant times, Defendant designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold Juvederm Products, which are unreasonably dangerous and defective to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the risk of granuloma or delayed onset granuloma. These actions were under the complete control and supervision of Defendant – and, still, the Juvederm Products were released into commerce and directly marketed by Defendant to end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Juvederm.

112. At all relevant times, Defendant had a duty and a continuing duty to properly manufacture, test, market, label, handle, distribute, store, sell, provide proper warnings and/or take such steps as necessary to ensure that their Juvederm Products did not cause users and consumers to suffer from or have knowledge of unreasonable and dangerous risks. Not only is Defendant considered to be an expert in the field, but had complete control over the knowledge and dissemination of warnings regarding the potential and actual harms that the Juvederm Products caused Plaintiff Garcia and Class members.

113. Defendant failed and did not investigate, study, test, or promote safety to minimize dangers to users and consumers of their Juvederm Products and to those who would be foreseeable users or those who would be injured by Defendant's Juvederm Products.

114. Under state law, a manufacturer has a duty to provide an adequate warning sufficient to render the product not unreasonably dangerous to the user if it knew or in light of reasonable available knowledge should have known about the risks the Juvederm Products could and actually did cause.

115. Additionally, Defendant did breached their duty to adequately inform Plaintiffs and Class members of the risk of using Juvederm Products, proximately causing injury to a foreseeable risk of medical patients.

116. Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interests, costs herein incurred, attorneys' fees and all such other relief deemed just and proper.

**COUNT VI**
**UNJUST ENRICHMENT**
**NATIONWIDE CLASSES**
***And All Substantially Similar State Laws***

117. Plaintiffs repeats the allegation in Paragraphs 1-81 as if fully set forth with the same force herein.

118. As a result of Defendant's unlawful and misleading labeling and warning labels, Defendant was enriched at the expense of Plaintiffs and Class members.

119. Defendant sold the Juvederm Products which were not capable of being sold legally and were worthless. s

120. Plaintiff and Class members paid a price premium for the Juvederm Products.

121. It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from what Plaintiffs and Class members overpaid for the Juvederm Products and/or all monies paid for which the Plaintiffs and Class members for the Juvederm Products.

122. It would be unjust and inequitable for Defendant to retain these benefits, warranting restitutionary disgorgement into a constructive trust for all of these monies or the amounts overpaid by Plaintiffs and Class members for the Juvederm Products.

123. As a direct and proximate cause of Defendant's actions, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

124. Plaintiffs, on their own behalf and on behalf of the Class and the Sub-Class, request the following relief:

a. An order certifying the Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class and Sub-Class Representative and their attorneys as Class Counsel;

b. A declaration that Defendant are financially responsible for notifying Class and Sub-Class members of the pendency of this suit;

c. An order declaring that Defendant's conduct violates the consumer protection statutes cited;

d. Actual damages;

e. Statutory damages;

f. An order providing appropriate equitable relief in the form of an injunction against Defendant's unlawful and deceptive acts and practices, and requiring proper, complete, and accurate representation and labeling of the alleged Products;

g. Restitution for members of the Class and Sub-Classes to recover Defendant's ill-gotten benefits;

h. A disgorgement of profits earned on the products sold as well as a disgorgement of the profits earned on the premiums charged to the Class and the Sub-Classes;

i. Pre- and post- judgment interest on all amounts awarded;

j. Other injunctive relief as the Court may deem appropriate; and

k. An order awarding Plaintiffs and the Class and Sub-Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

125. Plaintiffs hereby demand a trial by jury.

DATED: Sept. 24, 2026

Respectfully submitted,

*/s/ Blake Hunter Yagman*

Blake Hunter Yagman
**YAGMAN PLLC**
RXR Plaza
626 RexCorp Plaza
Uniondale, New York 11556
Tel.: (929)709-1493
*blake.yagman@yagmanpllc.com*

Michael R. Reese
(NDIL Gen. and Trial Bar No. 90785808)
**REESE LLP**
5544 Central Avenue
St. Petersburg, Florida 33707
Tel.: (917) 596-3283
*mreese@reesellp.com*

Carlos F. Ramirez
(NDIL Gen. Bar Pending Admission)
**REESE LLP**
1000 W. 93rd Street, 16th Floor
New York, New York 10025
Tel.: (212) 643-0500
*cramirez@reesellp.com*

*Attorneys for Plaintiffs and the Proposed Classes*